Leonard Uresti ROJAS, Appellant,

v.

The STATE of Texas, Appellee.

No. 72475.

Court of Criminal Appeals of Texas.

Sept. 23, 1998.

Dick Turner, Cleburne, for appellant.

David W. Vernon, Asst. DA, Cleburne, Matthew Paul, State's Atty., Austin, for State.

### OPINION

MEYERS, Judge, delivered the opinion of the Court in which McCORMICK, Presiding Judge, and MANSFIELD, KELLER, PRICE, HOLLAND and WOMACK, Judges, joined.

Appellant was convicted of capital murder for an offense committed on or about December 27, 1994. TEX. PENAL CODE ANN. § 19.03(a)(2). The jury affirmatively answered the punishment question set forth in Texas Code of Criminal Procedure Article 37.071 § 2(b)(1) and negatively answered the

question in Article 37.071 § 2(e).[1] The trial judge sentenced appellant to death pursuant to Article 37.071 § 2(g). Direct appeal to this Court is automatic. Article 37.071 § 2(h). Appellant raises twelve points of error. We will affirm.

In appellant's first, second, and third points of error, he contends the trial court erred in denying his Motion for Instructed Verdict and Motion for New Trial because a fatal variance existed between the indictment and proof at trial. Appellant asserts this fatal variance resulted in a failure to provide adequate notice to appellant of the charges against him, a failure to afford him adequate protection against re-prosecution for the same offense, and rendered the evidence insufficient to sustain the conviction. In points of error four and five, appellant argues the trial court erred in denying his Motion for New Trial because the evidence presented at trial was legally and factually insufficient to support the jury's guilty verdict. These points of error necessitate a review of the facts of the case.

On the evening of December 27, 1994, Fabian Narvaez took his sons, Adrian and Eric Narvaez, to a Texaco station in Arlington, Texas, to meet their mother, Jo Ann Reed (Narvaez's ex-wife). The boys had just completed a Christmas holiday visit with their father and were scheduled to meet their mother at 7:00 p.m. at the Texaco station, the usual exchange point agreed to by Narvaez and Reed. When Reed had not appeared and could not be reached by 8:05 p.m., Adrian called his aunt, Linda Hancks (Reed's sister). Hancks drove to the Texaco, picked up the boys, and took them to her house. After trying unsuccessfully to reach Reed, she called her sister, Terry Ceballos. Ceballos informed Hancks that she had been calling Reed all day and had repeatedly encountered a busy signal. The two sisters then drove together to the area of Johnson County, where Reed lived with appellant (her boyfriend or common law husband), his brother, David Rojas, and Reed's two sons in a double-wide trailer.

When Hancks and Ceballos arrived at the home at approximately 9:20 p.m., appellant's car was parked in the driveway and the trailer was completely dark. After pushing past two large trash cans which were blocking the back door, they discovered Reed's bloody body buried under a pile of sheets, blankets and pillows on the bed in the master bedroom. A white plastic bag was tied tightly around Reed's head. With some effort, Hancks was able to pry off the bag, then discovered that Reed had a gunshot wound in the center of her forehead and seemed to have been dead for some time. Hancks also noticed a .32 caliber weapon lying on the bed. Ceballos later discovered David Rojas' body in the second bathroom. Rojas had apparently been shot multiple times.

The sisters called 9-1-1 and were told to leave the trailer. The police arrived and began investigating the murders. At some point, officers on the scene received a call notifying them that Dallas police were holding a man who had apparently confessed to these killings to security guards in a bus station. Johnson County officers traveled to Dallas where they were introduced to appellant who immediately began confessing his actions to them and had to be stopped so officers could read him his *Miranda*[2] rights.

At approximately 2:00 a.m., December 28, 1994, appellant willingly gave Johnson County officers a written statement in which he admitted killing Reed and his brother and explained the events leading up to the murders. The Johnson County police then took appellant back to the scene of the crime, where he made a videotaped statement in which he toured the house explaining the events. Police took an additional statement from appellant at around 1:00 p.m. on the 28th after appellant had eaten breakfast and rested to verify the accuracy of the first two statements. When compared, the three statements contain minor inconsistencies but recount substantially the same events.

---

**1.** Any further reference to articles will be to those in the Texas Code of Criminal Procedure in effect at the time of the offense unless otherwise noted.

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellant stated that he and the victims, Reed and David Rojas, had stayed up all night playing dominoes and using drugs (marijuana, cocaine, and methamphetamine). According to appellant, at around 9:30 a.m. on the morning of the 27th following this all-night binge, he was in the kitchen making coffee and saw Reed emerge from Rojas' bedroom. Appellant confronted Reed because he suspected that she had been sleeping with Rojas. Reed denied this accusation. Appellant and Reed went to the master bedroom, then Reed removed her clothing. She offered to perform fellatio on appellant and appellant accepted her offer. Appellant claims that, after completing this act, Reed told him she had met a new man (apparently not David Rojas) and asked appellant to move out of the house. Appellant angrily refused to move out and Reed told him that they would make him leave. Appellant reached under the dresser, retrieved his gun (a .32 caliber Smith and Wesson) and shot Reed between the eyes. He then put on his robe, knocked on the bathroom door, and asked Rojas to come out of the bathroom. When Rojas opened the door, appellant shot him three times.

After shooting Rojas, appellant noticed that Reed was still breathing. Ostensibly in order to end her suffering, appellant tied a plastic bag tightly over her head. Appellant then covered the bodies, sat down in the kitchen, and drank a cup of coffee. He thought about what he had done and decided he would have to leave the house. During this period, Lisa Gonzales, a friend of Reed's, called twice on the telephone, and Pam Raby, a coworker of Reed's, called once. Appellant told both of them that Reed was ill and could not talk on the phone. He told Raby that Reed could not come to work. He took the four empty shells out of the gun and threw them in a trash can by the pool table. He prepared to leave, but could not find his car keys. After searching for the keys for some time in vain, appellant left the house on foot. He hitchhiked to the Fort Worth bus station, then bought a bus ticket to Atlanta, Georgia. He only made it as far as Dallas, where he confessed to security guards.

Assistant Medical Examiner Dr. Marie Araneta testified that Reed had a gunshot wound to the forehead. Bullet fragments were found in her head. Gunpowder residue indicated the gun was within one inch of her head when fired. Reed's urine tested positive for metabolites of marijuana, cocaine, and nicotine. Her blood tested negative for these substances. Dr. Araneta also discovered dried blood around Reed's anal opening and vagina and a contusion of the groin, indicating some kind of trauma such as penetration by a foreign object (no sperm was detected). David Rojas received several gunshot wounds to the chest, leg, head, and neck. His urine tested positive for metabolites of marijuana, cocaine, caffeine, and nicotine. His blood was also negative. Dr. Araneta opined that the cause of death of both victims was the gunshots wounds they received, although she noted that Reed's cause of death could have been compounded by asphyxiation with the plastic bag.

Dan Dykes testified that appellant appeared at his house at 3:30 or 4:00 p.m. on December 27th. Appellant asked for a ride to the bus station or to the house of some friends. Dykes agreed to take appellant to the friends' house but they were not home. Appellant then asked for a ride from some people driving by in a pickup truck and left with them. Gonzales confirmed that she had called the house twice looking for Reed and appellant had told her she was ill. Raby stated she had called the house at around 3:20 p.m. to see if Reed would be working her shift, which started at 3:00. Appellant told her Reed was sick and would not be working her shift. In addition, police found four shell casings in the family room trash can consistent with the .32 caliber weapon found at the house.

█ Appellant's first, second, and third points of error turn on the question of whether a fatal variance existed between the indictment and the proof at trial. Appellant points out that the indictment charged him with causing the death of Reed by shooting her with a firearm. He cites at length the trial testimony of Dr. Araneta, arguing that it presents evidence of a cause of death different from the cause named in the indictment,

i.e., the trial testimony showed asphyxiation via a plastic bag being tied over the victim's head. He asserts that, when the State alleges specific information which is descriptive of an essential element of the offense, the State must prove that descriptive matter. Thus, the State was required to prove beyond a reasonable doubt that appellant caused Reed's death by shooting her with a gun, not suffocating her with a plastic bag. He claims this fatal variance between the indictment and the proof at trial deprived him of notice and subjected him to re-prosecution.

■■■ When an indictment facially alleges a complete offense, the State is bound by the theory alleged in the indictment, as is the reviewing court in its sufficiency analysis. *Montoya v. State*, 906 S.W.2d 528, 529 (Tex. Crim.App.1995); *Fisher v. State*, 887 S.W.2d 49, 57 (Tex.Crim.App.1994). And, a variance between the indictment and the evidence at trial may be fatal to a conviction, because Due Process guarantees the defendant notice of the charges against him. *Stevens v. State*, 891 S.W.2d 649, 650 (Tex.Crim.App.1995); *Ward v. State*, 829 S.W.2d 787, 794 (Tex. Crim.App.1992). However, not every variance between the evidence at trial and the indictment is fatal. Only a material variance is fatal. *Stevens, supra*. A variance between the charging instrument and the proof at trial is material only if it operated to the defendant's surprise or prejudiced his rights. *Id.*; *Human v. State*, 749 S.W.2d 832, 837 (Tex.Crim.App.1988). In this case, however, there was no variance, material or otherwise. The evidence supported the indictment.

Testimony at trial showed Reed's official cause of death as determined by the medical examiner was a gunshot wound to the head— the same cause of death specified in the indictment. In response to a hypothetical question, Dr. Araneta conceded that Reed's immediate cause of death could also have been asphyxiation from the plastic bag. This observation was based on the assumption that Reed was still breathing and alive when the plastic bag was placed over her head.[3] However, Dr. Araneta emphasized that the asphyxiation would merely have compounded the existing injury to the respiratory control center of the brain caused by the gunshot. She noted that, even in the hypothetical situation posed, she would consider the gunshot wound to be an *equally important cause of death* to the plastic bag due to the cumulative effect from the weakened respiratory control center. The proof at trial was consistent with the indictment's allegation that the victim was killed by a gunshot to the head and this was the theory presented to the jury in its charge; appellant has not shown a fatal variance between the indictment and the proof at trial. *Cf. Wright v. State*, 388 S.W.2d 703, 706 (Tex.Crim.App.1965)(evidence sufficient to sustain allegation in indictment that victim killed by shooting with pistol, where act of shooting contributed to death, though there were other concurring causes). Appellant's first three points of error are overruled.[4]

■■ In his fourth and fifth points of error challenging the sufficiency of the evidence, appellant argues the State failed to sufficiently prove its case on two points: Appellant's intent and the manner and means of death. First, appellant contends that his intoxication at the time of the offense made him incapable of forming the necessary intent. Further, appellant asserts that evidentiary sufficiency is measured against the charge that was actually given to the jury. He argues the charge in his case only listed one means of death of Reed (shooting with firearm), while the evidence showed Reed could have died due to asphyxiation. Thus, he insists, the evidence does not conform to the instructions given and is insufficient as a matter of law.

■■ In performing a legal sufficiency analysis, we review the evidence in the light most

---

**3.** This fact scenario was suggested by appellant's statement to police, but was not apparent from the medical evidence alone.

**4.** Further, we note that appellant's argument pertaining to his second point of error on protection against re-prosecution consists primarily of the bare assertion, "Had the jury returned a verdict of not guilty, Appellant could have been charged with, indicted for, and retried for the offense of capital murder, with the manner and means of Jo Ann Reed's death being alleged as asphyxiation." Appellant fails to support this assertion with legal authority or argument.

favorable to the verdict, and ask whether any rational trier of fact could have rendered the jury's findings beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; *Barnes v. State,* 876 S.W.2d 316, 321–22 (Tex.Crim.App.), *cert. denied,* 513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). When performing a factual sufficiency analysis, all the evidence is viewed without the prism of "in the light most favorable to the prosecution" and set aside the verdict only if it is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). A clearly wrong and unjust verdict is "manifestly unjust," "shocks the conscience," or "clearly demonstrates bias." *Santellan v. State,* 939 S.W.2d 155, 164 (Tex.Crim.App. 1997); *Jones v. State,* 944 S.W.2d 642, 647–48 (Tex.Crim.App.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997).

In addressing appellant's sufficiency claims, we first generally observe that, viewed in the most favorable light, the evidence supports the jury's guilty verdict. Further, even when all of the facts contrary to the jury's result are considered, the verdict does not appear to be clearly wrong and unjust. We now address applicant's specific arguments:

■ With regard to appellant's intent argument, we note that under Texas Penal Code, Section 8.04, voluntary intoxication cannot constitute any defense to the commission of a crime. *Taylor v. State,* 885 S.W.2d 154, 156 (Tex.Crim.App.1994). Appellant's argument that his intoxication made him incapable of forming the necessary intent is not viable under a legal or factual sufficiency analysis. It is clear under section 8.04 that voluntary intoxication is not to an excuse to commission of any crime, and therefore may not be considered as having negated an element of an offense.

■ Appellant also argues the evidence of Reed's cause of death does not conform with the instructions given to the jury that appellant intentionally caused the death of the victims with a firearm during the same criminal transaction. Appellant does not dispute the evidence that David Rojas was killed by

several shots from a firearm, that Reed was shot in the head with a firearm, and that the victims were killed in the same criminal transaction; the only question appears to involve Reed's immediate cause of death (i.e., asphyxiation or gunshot wound).

The State presented ample evidence that Reed was killed by a shot to the head with a .32 caliber firearm fired by appellant. Also, the official cause of death determined by the medical examiner was a gunshot wound to the head. As noted above, Dr. Araneta conceded that the immediate cause of death could have been asphyxiation if Reed was still alive when the plastic bag was placed over her head. Dr. Araneta also recognized the remote possibility that Reed could have survived the gunshot wound in some limited capacity if given immediate medical attention. However, she stated that Reed would have died from the gunshot wound eventually, and *the gunshot wound would be an equally important cause of death even if the asphyxiation had been the immediate catalyst,* because a fragment of the bullet had struck and damaged the respiratory control center of Reed's brain. Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found that Reed's death was ultimately caused by the gunshot to the head, whether she died before or after appellant placed the plastic bag over her head. And, even if the evidence favorable to appellant's arguments is examined without the prism of "in the light most favorable to the prosecution," the jury's verdict is not clearly wrong or unjust. We overrule appellant's fourth and fifth points of error.

■ Point of error six represents a claim that the evidence is factually insufficient to support the jury's answer to the future dangerousness special issue. This Court has declined to perform a factual sufficiency analysis of this special issue. A factual sufficiency review of a jury's determination of the probability of future dangerousness is not possible and not required by the Texas Constitution. *McGinn v. State,* 961 S.W.2d 161, 166–69 (Tex.Crim.App.1998). Point six is overruled.

In appellant's seventh point of error he contends the trial court abused its discretion in allowing the jury to separate for an extended period of time during the punishment phase of trial (approximately seven days). He contends that, pursuant to Articles 35.23 [5] and 36.29,[6] reversal is required if the jury is permitted to separate (without the personal consent of the defendant) after the guilt/innocence charge is read to the jury, unless the State successfully rebuts the presumption of harm. Appellant argues he was prejudiced by the trial court's action because the jurors were "free to be influenced by anyone or anything" for the seven days they were apart.

On May 23, 1996, after the jury had rendered their guilty verdict but before the presentation of evidence at the punishment phase of trial, the trial judge received a phone call from a juror's sister notifying him that the mother of the juror was critically ill and was not expected to live. The sister stated that all family members needed to come immediately to the hospital in Memphis, Tennessee. The trial judge asked the attorneys for comments on his potential courses of action. The defense objected to recessing the jury and later reconvening it, arguing the juror in question would be distracted and the remedy provided by statute in this type of situation is the permanent discharge of the jury. The judge nevertheless recessed the jury until the following week. Prior to separation, the judge strictly instructed the jury to not read anything about the case, not listen to anything about the case, and not discuss the case with anyone (even another juror). On May 30, 1996, the jury reconvened. The judge questioned the juror whose mother was ill. The juror indicated that his mother's condition had improved, and stated he could give full consideration to the case and continue serving as a juror without being distracted by his mother's illness.

Under the pre–1989 version of Article. 35.23, the jury was not permitted to separate after the reading of the court's charge until a verdict was rendered or the jury was discharged unless the defendant consented to the separation. *Harris v. State*, 738 S.W.2d 207, 212 (Tex.Crim.App.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987) ("The statute requires reversal if the jury is allowed to separate after the court's charge has been given unless the defendant consents"); *see also Gregg v. State*, 881 S.W.2d 946, 950 (Tex.App.—Corpus Christi 1994, pet. ref'd). Post–1989, Article 35.23 forbids separation of jurors after the charge is read if the court sequesters the jury (on the motion of a party or on its own motion) "until a verdict has been rendered or the jury finally discharged." Article 35.23; *Gregg*, 881 S.W.2d at 950.

In the instant case, appellant does not assert that he made a motion for sequestration or that the jury was, in fact, sequestered at the immediate point of the separation. Further, we have not located a motion to sequester in the trial record. However, upon separation, the trial court stated in the record: "[t]his means the jury will be released from sequestration." Thus, the jury may have been sequestered at that time. Nevertheless, as noted above, the separation occurred after the jury had rendered its guilty verdict and before it commenced punishment deliberations or even heard any punishment testimony (i.e., before the punishment charge had been read). Under Article 35.23, although the jurors had not been finally dis-

---

5. Article 35.23 in effect at the time of the offense provides in relevant part:

 The court may adjourn veniremen to any day of the term. When jurors have been sworn in a felony case, the court may, at its discretion, permit the jurors to separate until the court has given its charge to the jury. The court on its own motion may and on the motion of either party shall, after having given its charge to the jury, order that the jury not be allowed to separate, after which the jury shall be kept together, and not permitted to separate except to the extent of housing female jurors separate and apart from male jurors, until a verdict has been rendered or the jury finally discharged.

6. Article 36.29 provides in relevant part:

 (c) After the charge of the court is read to the jury, if any one of them becomes so sick as to prevent the continuance of his duty, or any accident of circumstance occurs to prevent their being kept together under circumstances under which the law or the instructions of the court requires that they be kept together, the jury shall be discharged.

charged, "a verdict ha[d] been rendered." The relevant phase of trial was then the punishment phase and the punishment charge had not yet been given to the jury.[7] Thus, Article 35.23 did not prohibit the trial judge from allowing the jurors to separate at this point, even without appellant's consent.

As for Article 36.29, that statute only mandates that the jury be discharged if a juror's circumstances prevent the jury from being kept together "[a]fter the charge of the court is read to the jury." Again, because the guilt/innocence phase of the bifurcated trial had been completed and the punishment charge had not yet been given, no violation of the statute occurred. *See Sanchez v. State,* 837 S.W.2d 791, 795 (Tex.App.—Hous. [14th Dist.] 1992, pet. ref'd); *Campbell v. State,* 644 S.W.2d 154, 162, 165 (Tex.App.—Austin 1982, pet. ref'd). We overrule appellant's seventh point of error.

██ Appellant argues, in his eighth point of error, that the trial court erred in admitting State's Exhibits Thirteen through Sixteen, when their prejudicial effect outweighed their probative value. TEX.R.CRIM. EVID. 403. Appellant claims these photographs of the victims' bodies were gruesome, close-up and in color. He complains of one photograph in particular (State's Exhibit Sixteen) which depicts injuries to Reed's pelvic area, maintaining that this photo did not demonstrate the victim's cause or manner of death. He alleges this picture was introduced to confuse the issues and mislead the jury "as evidence was never presented that appellant caused any trauma to the victim's vagina." Appellant also complains that the judge made a ruling on appellant's objections to these photographs prior to appellant making any objections to the pictures and failed to review all of the necessary elements in making his decision.

██ Rule 403 requires an admissible photograph to possess "some probative value and that its probative value not be substan-

tially outweighed by its inflammatory nature." *Long v. State,* 823 S.W.2d 259, 272 (Tex.Crim.App.1991), *cert. denied,* 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). Relevant factors in making this determination include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up shots, whether the body is naked or clothed, the availability of other means of proof, and other circumstances unique to the individual case. *Santellan,* 939 S.W.2d at 172. The admissibility of photographs over a challenge is within the sound discretion of the trial judge. *Sonnier v. State,* 913 S.W.2d 511, 518 (Tex.Crim.App. 1995). Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself. *Santellan, supra; Burdine v. State,* 719 S.W.2d 309, 316 (Tex.Crim.App.1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987).

The first three photos complained of are autopsy pictures depicting the gun shot wounds received by David Rojas. The pictures are approximately five by seven inches in size, are moderate, but not extreme, close-ups, and were originally color photographs (the trial record contains black-and-white reproductions). No clothing is visible in the pictures. These photos focus on the various entrance and exit wounds of the bullets and are not unnecessarily gruesome. State's Exhibit Sixteen is a picture of Reed's unclothed body with her legs spread apart, which displays trauma to her pelvic area. It is also approximately five-by-seven inches in size, was originally in color, and is not a close-up (Reed's torso and head are visible in the picture). Again, the photo does not appear unnecessarily gruesome or intrusive, given the wound being illustrated. None of the photos reveal any injuries due to autopsy procedures.

██ Contrary to appellant's assertion, other evidence on the subject matter of

---

7. Appellant contends that the term "charge" as used in the statute refers only to the guilt/innocence charge and any separation after that charge had been read was error. We disagree. "Since this was the second phase of a bifurcated trial, in which a completely different charge is given to the jury," the term "charge" in the statute logically refers to the charge at the punishment phase. *See Sanchez v. State,* 837 S.W.2d 791, 795 (Tex.App.-Hous. [14th Dist.] 1992, pet. ref'd); *Campbell v. State,* 644 S.W.2d 154, 162, 165 (Tex.App.—Austin 1982, pet. ref'd).

State's Exhibit Sixteen was presented at trial. Dr. Araneta testified concerning dried blood around Reed's anal opening and vagina and a contusion of the groin, indicating some kind of trauma such as penetration by a foreign object. This photo was used to show that the blood from Reed's head wound did not travel down her torso to her groin area (i.e., the dried blood in the groin region indicated a separate injury). Although the groin injury was not the direct cause of Reed's death, the evidence suggested that appellant inflicted it during the same continuous transaction. *See Santellan*, 939 S.W.2d at 168–70; *Brown v. State*, 696 S.W.2d 913, 914 (Tex.Crim.App.1985). Evidence of this additional injury was probative of appellant's mental state at the time of the murder, the specific circumstances of the murder, and the fact that appellant omitted some information from his statements to the police. Appellant has not shown that the prejudicial impact of State's Exhibits thirteen through Sixteen outweighed their probative value.

 Finally, we address appellant's claim that the trial court prematurely ruled on appellant's objections to the photographs and did not correctly perform the Rule 403 balancing test. Although the judge accidentally ruled before appellant's objections to the photographs had been explicitly articulated (the judge was apparently confused by appellant's objection to a leading question), he immediately corrected his mistake and allowed appellant to fully articulate his objections to the pictures before overruling them. This Court has held that the trial court is *required* to perform the Rule 403 balancing test when the offering party makes the appropriate objection. *Santellan*, 939 S.W.2d at 173; *Long*, 823 S.W.2d at 271. However, where nothing in the record shows the trial judge did not perform the balancing test, we have found no error when the judge simply listened to the defendant's objections, then overruled them. *Santellan, supra.* In the instant case there is nothing to indicate the judge did not perform the required balancing test. In fact, the judge held a hearing outside the presence of the jury to obtain the necessary information to make this decision. Appellant's eighth point of error is overruled.

 Appellant next contends the trial court erred in denying his motion for mistrial after sustaining his objection to the testimony of a State's witness. At the guilt/innocence phase of trial, Texas Ranger George Turner made the following statement in response to a question about whether Turner believed the version of events given by appellant in his confession:

I believe that she wanted him to move out. She knew because of his past anger, his past violence that that was the only way—

Defense counsel objected and moved for a mistrial because the comment was not responsive to the question, beyond any evidence presented at trial, prejudicial and inflammatory, and a violation of appellant's due process rights. The trial court sustained the objection and instructed the jury to disregard Turner's comment, but denied appellant's motion for mistrial.

 A witness's inadvertent reference to an extraneous offense is generally cured by a prompt instruction to disregard. *Kipp v. State*, 876 S.W.2d 330, 339 (Tex.Crim.App. 1994); *Nobles v. State*, 843 S.W.2d 503, 514 (Tex.Crim.App.1992). An exception exists where the reference was clearly calculated to inflame the minds of the jury or was of such damning character as to suggest it would be impossible to remove the harmful impression from the jurors' minds. *See Kipp, supra; Barnes*, 876 S.W.2d at 327; *Kemp v. State*, 846 S.W.2d 289, 308 (Tex.Crim.App.1992), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993).

In the instant case, Turner's response reflects a misunderstanding of the question on the part of the witness which was not anticipated by the State. Also, Turner's comment was not a concrete reference to an extraneous offense, but merely vague speculation. Due to defense counsel's timely objection, Turner was prevented from elaborating on the mentioned extraneous conduct. Moreover, the trial judge's prompt sustaining of counsel's objection conveyed the appropriate message that the witness's comment was not supported by the evidence and was not to be considered. Therefore, the trial judge's instruction to disregard cured any error and the judge did not abuse his discretion in

overruling appellant's motion for mistrial. We overrule appellant's ninth point of error.

 In point of error ten, appellant claims the trial court abused its discretion by denying his motions for mistrial after three prospective jurors' comments allegedly tainted the entire venire panel. Specifically, appellant calls our attention to veniremembers' testimony concerning a comment allegedly made by a prospective juror which was something like, "they should just take him out and shoot him." A different veniremember heard another prospective juror make the comment, "[i]f they did the crime they need to be punished." Also, the record shows another prospective juror may have said something like they should "fry him automatically."

 It is within the discretion of the trial judge to determine jury misconduct. *Rousseau v. State,* 855 S.W.2d 666, 683 (Tex. Crim.App.1993), *cert. denied,* 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993). The trial court is the sole judge of the credibility of the testifying jurors. *Lewis v. State,* 911 S.W.2d 1, 7 (Tex.Crim.App.1995). In the absence of any evidence that any of the trial jurors made, heard, or could have been influenced by the complained-of remarks, no prejudice is shown. *Freeman v. State,* 556 S.W.2d 287, 308 (Tex.Crim.App.1977), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 794 (1978); *see also Nelson v. State,* 881 S.W.2d 97, 102 (Tex.App.—Hous.[1st Dist] 1994, pet. ref'd) ("[a]bsent any evidence in the record that members of the jury heard the remark, the appellant was not harmed by it").

The trial court, defense counsel, and the prosecutor questioned the five members of the venire panel who could be identified as have made or heard a prejudicial comment. One of these five admitted to making a comment (that murderers should be prosecuted) and four were identified as having heard a comment (versions of the comment varied). The court excused two of the five, appellant exercised peremptory challenges against two more, and jury selection was completed before the remaining individual was reached in the sequence of individual voir dire examination. Appellant contends that at least twenty-eight prospective jurors, in addition to the

five who testified, heard one of the prejudicial comments. The record includes neither evidence of the identity of those additional prospective jurors nor evidence that any person who actually served on the jury heard the comments. Appellant has not shown that any of the trial jurors made, heard, or could have been influenced by the complained-of remarks. We overrule appellant's tenth point of error.

 In his eleventh point of error, appellant claims the trial court erred in admitting evidence of extraneous offenses at the punishment phase when proper notice was not given as required by Article 37.07 § 3(g). The trial court overruled appellant's extraneous offense objections. To support those objections applicant cites the reasonable notice requirement contained in Rule 404(b) of the Texas Rules of Criminal Evidence and Article 37.07's notice requirement. Rule 404(b) does not govern the admissibility of character evidence at the punishment stage of trial. *Vuong v. State,* 830 S.W.2d 929, 942 (Tex.Crim.App.1992), *cert. denied,* 506 U.S. 997, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992). The appropriate governing provision is Rule of Criminal Evidence 404(c), which does not contain a notice provision. *Id.* Further, Article 37.07 does not apply to capital murder cases. And, Article 37.071, the statute governing punishment phase procedure in a capital murder case, contains no notice requirement. *Id.* Point of error eleven is overruled.

 In appellant's last point of error, he argues the trial court erred in denying his motion to voir dire the prospective jurors on the law regarding parole (i.e., the meaning of a life sentence) in a capital case. We have held repeatedly that parole is not an issue applicable to a capital murder case and, therefore, the trial court does not err in disallowing voir dire questions concerning parole. See, e.g., *Collier v. State,* 959 S.W.2d 621, 623–24 (Tex.Crim.App.1997), *pet. for cert. filed* (U.S. May 12, 1998) (No. 97–9054); *Eldridge v. State,* 940 S.W.2d 646, 651 (Tex. Crim.App.1996); see also *Smith v. State,* 898 S.W.2d 838 (Tex.Crim.App.) (plurality op.), *cert. denied,* 516 U.S. 843, 116 S.Ct. 131, 133

L.Ed.2d 80 (1995) and *Broxton v. State,* 909 S.W.2d 912, 919 (Tex.Crim.App.1995) (adopting reasoning in *Smith* plurality opinion). Appellant's twelfth point of error is overruled.

Finding no reversible error, we affirm the judgment of the trial court.

KELLER, J., filed a concurring opinion, joined by McCORMICK, P.J., and OVERSTREET, J., dissented to points of error six and twelve.

BAIRD, J., not participating.

KELLER, J., concurring.

Art. 36.29 requires that a jury be discharged if a juror becomes disabled so that he is unable to continue his duty or if the jury is prevented from being kept together "under circumstances under which the law requires that they be kept together." The "disabled" language seems to contemplate a permanent disability from continuing one's duty as a juror. Juror Smith was not "disabled" under Art. 36.29 because he was able to continue his duty, albeit after a delay. The question then becomes whether Art. 36.29 required discharge of the jury because "the law required" that the jury be kept together. Art. 35.23 allows a jury to be sequestered after the charge is given. The majority understands Art. 35.23 to require sequestration for the period beginning with the charge on guilt/innocence and ending with the verdict of guilty, and for the period beginning with the charge on punishment and ending with the verdict on punishment, but not for the period between the guilty verdict and the charge on punishment. I think this is a reasonable reading of the statute, but even if it is not there was no reversible error in this case.

Art. 35.23 states that after the charge is given, a trial court *may* sequester a jury on his own motion but *must* sequester a jury on motion of either party. I think the jury had been sequestered in this case. However, the record does not show a motion to sequester the jury. Thus, the sequestration could have been on the court's own motion. If the jury is sequestered on the court's own motion, the "law requires" that it be kept together. But since sequestration after the charge is permissive rather than mandatory if it is on the court's own motion, it appears plain that the court that ordered sequestration could, in effect, dissolve that order and allow the jury to separate.

The same is true if the sequestration was on the State's motion. The State's request to allow the jury to separate would be, effectively, a request to withdraw its motion, which the court could allow.

If the sequestration was on motion of the defense, then "the law required" that the jury be kept together. We have held that in such cases the defendant is entitled to reversal unless the State successfully rebuts the presumption of harm raised by the improper jury separation. *Reed v. State,* 595 S.W.2d 856 (Tex.Crim.App.1980). But although a harm analysis is appropriate, *see Cain v. State,* 947 S.W.2d 262 (Tex.Crim.App.1997), harm should no longer be assessed by the standard used in *Reed.* Because any error is statutory (failure to comply with Art. 35.23) rather than constitutional, the proper test for harm is provided by R. 44.2(b) of the Texas Rules of Appellate Procedure: any error in allowing the separation of the jury that did not affect substantial rights must be disregarded. Here, the record shows that prior to the separation the trial court instructed the jury not to read anything about the case, not to listen to anything about the case, and not to discuss the case with anyone. On this record, any error in allowing the jury to separate was harmless.

With these comments, I join the opinion of the Court.

McCORMICK, P.J., joins.